Clerk, please call the final case of the day. 5-15-0-0-6-7 Mark McManus v. Workers' Compensation Commission 5-15-0-0-6-7 Mark McManus v. Workers' Compensation Commission May it please the court, good afternoon, counsel. Kevin Hazlett, fourth petitioner. The last case sort of gave me a couple of things to talk about. The situation here, I wish we had a 17-page decision from the commission. In this case, we don't. We have an arbitrator's decision, and I've indicated in the brief and the reply brief the sort of problems that we had with changing of arbitrators and so forth and with the record. And then we have the single-page affirmation by the commission that doesn't really give us any guidance or any help with anything. And with the very involved record that we have here, we're really just talking about two things, in my view, which number one would be the permission of the employer, and number two is the cause of accident. Martin was hired as a 17-year-old who left high school in his junior year and went to work. He did not have any applicable work experience or training, especially with the type of work done with the respondent. Now, how does that tie into this case that he didn't have any training? I mean, to be blunt, is this a personal risk or was this a risk that was inherent in the claimant's work? Wasn't this sort of a personal risk? It was. And as this court has indicated in a couple of prior decisions, there's a lot of confusion with terminology of person, personal risk, personal projects, personal comfort. The cases sort of run the whole gamut. Personal comfort is totally different. Right. The question is, I mean, how do we dispute this? Was he working on something that was his personal project to benefit him, or was he doing work for the company at the time of the accident? Let's at least pin that down. No, we don't. We agree he was doing something for his personal benefit. Right. And generally that would not be compensable, would it? Generally, generally. And our whole point is when you start with the case that they strongly talk about, which is Orsini,  What caused this to occur? Our point is the cause is you have a young man, a teenager, who goes to work at a place with no safety rules, no safety procedures, no safety training, nothing. And they just sort of throw him in the deep end, and he's allowed to use oxygen and acetylene torches, which are inherently dangerous. I wouldn't even try to start one, to light one myself. But he's allowed to do it. I'm sorry. Case law says that the personal risk is compensable if some aspect of the employment contributed to the risk or made the likelihood of injury greater. All right. Tell me if I understand your case. You're saying, yes, this was a personal thing he was involved in. However, the fact that the employer gave him permission to use dangerous equipment without properly training him is an aspect of the employment that makes this compensable. Exactly right. Okay. But it hinges, then, on permission or acquiescence, right? In other words, if the commission found that the employer did not give him permission, then your theory is out the window. Agree with that? Permission or acquiescence. On the case law, that is correct. So didn't the commission find Mr. Van Mierlo's testimony more credible than the petitioner's on that issue of permission? They did, without examining the OSHA record and the fire marshal's report. So we really get to, though, you know, it's a credibility determination on that issue of permission, and we would have to re-weigh that credibility issue. Setting aside for the time being the admissibility of these reports or whatever, they found if they believed Van Mierlo that he didn't even know anything about this until after the explosion, then your theory can't stand. Is that fair? I would say based on current case law it would, and simply because you have cases that say that acquiescence on its own cannot make it compensable, but it seems to say if you don't have acquiescence or permission, then it can't be. And I have a little problem with that, but generally speaking what you're saying is I agree with it. And if the OSHA report doesn't go in with all it contains, and the fire marshal's report don't go in, and they're not reviewed by the commission, the problem is, you know, he was presented with this information on cross-examination, and the arbitrator decided, the second arbitrator is the one who decided the case. All the second arbitrator did was sign the respondent's proposed decision, which I have a problem with as far as the evidence in this case. Maybe she read the record and everything. Maybe she didn't just sign it, but she didn't raise any issue really about the switching arbitrators. There's no issue on appeal. No, there's no issue on appeal as far as other than, you know, you have to look at everything in this case and all the things that happened before it, and you're talking about a tremendous transcript, and arbitrator Wise was under tremendous pressure at that time to get decisions out because this is not the only one that she was assigned to. I mean, you get me back to another point here, and I think you expressed in the record, that there's two reasons I want to introduce these reports. One is for impeachment of Van Mierlo on whether he gave permission, and the other is to show that they received violations from OSHA for failure to give proper training. Okay. But the arbitrator did allow you to use it for impeachment, and you read these statements to him. That's correct. And he denied it and so forth. Correct. And the arbitrator also allowed you to use the report on the safety, but actually by stipulation, as I recall from the record, I think opposing counsel said we'll agree he can use the report to bring out the violations, and you read from the report about the violations, and Van Mierlo admitted that. So what else would you have got out of the admission of them into evidence? Well, it's really a question without having a written decision from the commission because the arbitrator's decision really doesn't say anything about the information that are in these reports that contradict the arbitrator's ruling. This is why I find Van Mierlo more credible than the petition. Excuse me. The question was what else was in the reports that you needed that you say caused your client prejudice because it wasn't considered by the arbitrator? Well, the initial part of the report was he gave permission. That's what the hearing officer from OSHA put. He gave permission, and they wrote it two or three times. During the course of the investigation of six months, status reports are sent to the respondent. They're also sent to the teamsters. So all of this is not just information that's hidden somewhere. Let me just stop you there, though. There were no separate status reports presented or offered in evidence. I mean, this is just you ask a question to Van Mierlo and said, did you receive interim reports? And he said, yeah, I think I probably did, or words to that effect. And I can't explain why. But you didn't have any OSHA status reports, separate things monthly or whatever, that mentioned anything about him giving permission. The only report was this final report, and that's the one he disputed. I don't know if – well, the record of 50-something pages of motion is not just the final report. It's sort of everything because you can tell at the very beginning he interviewed Mr. Van Mierlo on May 3rd. So you can tell – it takes three hours minimum to go through the OSHA report and understand their thinking. But when I asked him about status reports, I wasn't couching it just in written stuff because there was something in the OSHA report talking about phone calls that were made on a regular basis. So maybe it was I was thinking one thing and then Mr. Van Mierlo was thinking something else about whether it was a phone call status. Here's where we are, and we're going to come back and talk to you again, and we're going to do this. I did find it a bit unusual that there was not an official letter or something like that on a sporadic basis two or three times during the investigation. But from a standpoint of if we believe the hearing officer and we believe the accuracy of this information, then he did give permission. And then at the very end when you read that closing conference note, it's a bit disturbing I think with some of the things in the comments of Mr. Van Mierlo when they were talking about, you know, you need to have your people examined by medical doctors to see if they're even qualified medically to wear a respirator. Then he makes a comment, can we make them pay for those exams? I mean, it's just the attitude of this company. Can I ask a question? What foundation did you lay for the introduction of these reports and evidence? Were they certified, doctor? Yes, sir. They were certified? Yes, sir. So you think they come in under the public records exception? Yes, sir. Okay. And I don't know if this court has the original OSHA report and what's in its file, but certification is an act of beauty. It's a gold seal and a ribbon and it's tied up. And if you look and see what the arbitrator said, because I didn't even break the seal to copy it. I had to get permission from the arbitrator to copy this. And she says, I understand your position. You may think by breaking the seal you have unauthenticated your document. I said, yes. Then I got permission. That's when everybody got copies. But the respondent had this information the whole time. They had it for years. This was no surprise to them. Mr. Van Mierlo's comments that I did not know about Martin or that I had given permission until the final report, his comments about when he gave permission were in the final conference, which is done before the final report. But you can tell from the conference notes, he interrupted the hearing often. I want to make it clear. We didn't get permission. I don't know if you can tell that from it. And also, it's unclear. I mean, of course, this didn't go into evidence, but it's in the record, the OSHA report. And one investigator was sent at the beginning, took some photos and so forth, and then another investigator was assigned who actually interviewed Van Mierlo. And it's not absolutely clear from the report, you know, who Van Mierlo supposedly told at the beginning that permission was given. I think it is from the... Well, the point is, I mean, this is where we get to hearsay and the purpose of hearsay, which is if you put all these people on the witness stand and cross-examine them, you find all these things out that aren't perfectly clear from reading the report or might be interpreted in a different way. Well, I don't think it's hearsay. I think because we offered both. We offered the whole thing. We offered both statements. They documented, wrote down, he gave permission. And at the end, he claimed, I did not give permission. So, you know, it's not being offered to prove the truth of the matter asserted. It's just being offered to prove that he said it. He said it here according to the hearing officer. Well, it's not true. What's the purpose of having it admitted? You know, I've been asking that question since law school, Judge, and I... Here's the thing. I understand your point. You've got hearsay within hearsay. What you want to get in is that Van Mierlo said I gave permission, okay? Right. Well, the investigator's assertion in the report that Van Mierlo said that, you're wanting that in for the truth of that, right? No, I just... You want to prove the truth of the investigator's assertion that Van Mierlo said he gave permission. No, not really.  It's confirmed by another impartial witness, the fire marshal. And my client testified to that. Those three things are here. And then he says at the end of the investigation, when they've had six months to figure out their game plan, what they're going to do and what they're going to say, and then he comes up and testifies, believe me, I tried my best to get an OSHA individual to testify. They just don't come. But you did get to cross-examine Van Mierlo about all that. Yes, yeah. And he could testify until an outcome on that. He just said the report's wrong. We submit. And if you believe that testimony, I understand. Yeah, I mean, he said, I agree that it says that in the report. I agree they said that. But I never gave permission, and I never told them that. Then you have to weigh that with the fire marshal's report and with my client's testimony under oath. So you have three things at the beginning, and we all know statements given at the beginning versus statements given six months later, they almost always change.  So our position is there's the permission, and then I don't think there's any question in the record that the incident of employment here is they didn't train him, and they even indicated in their brief he rarely used the acetylene torches. And yet, just one time you used an acetylene torch wrong, be it on your own barrel or the company's barrel, doesn't make any difference. If you're not trained on something like that, you're not trained, and consequences are going to happen. Okay, thank you, counsel. You'll have time to reply. I have to say, your understanding is fairly impressive. So are we. I mean, it's not every courthouse that's so equipped. I have never seen one. Only in the fourth district. Only in the fourth, because right across the street is where all the money is. You just undercut your position. I feel so short now. May I please support counsel? My name is Brandy Johnson, and I represent us in Bush and this matter. I was going to start with talking about a rising up, but the way the arguments have gone so far, I think I'm just going to skip right to permission. Actually, I'm going to back up just a little bit before I go to permission and talk about this use of an acetylene torch. Mr. McManus's job duties included driving, manufacturing tasks, shop work, stripping out forms, preparing forms, and pinning balls. Now, he did testify that rarely he would use an acetylene torch. The evidence is also that he had some experience using an acetylene torch from outside of his work at SM Bush. But when he used the acetylene torch, it was to fix things around, equipment around the shop, or to cut rebar. It was not to use it around hazardous explosive chemicals. The reason that this accident occurred was because Mr. McManus acquired barrels from a friend who in turn got them from the pattern dealership, brought them to the premises of SM Bush, and cut them open with an acetylene torch. The accident would not have occurred if he had not gotten barrels that had explosive hazardous chemicals in them. And may I point out, by the way, SM Bush used water-based chemicals. They did not have explosive hazardous chemicals on their premises. So even if they were going to train him on how to use an acetylene torch, there would have been no reason for them to provide training on how to safely use an acetylene, I have had trouble all weekend trying to say that word, torch around explosive hazardous chemicals. All right, so you're saying in so many words, even if they had trained him properly in the use of this torch, he was using it on something in a manner that would not have been covered under the work training. Yes, there would be no reason for them to train him. I mean, it would be like saying, let me train you on how to handle radioactive equipment properly when we don't use radioactive equipment, we don't have radioactive equipment here, we don't have radioactive equipment. So let me ask you this, and I was wondering if Mr. Hazlitt was arguing, this thought came to mind. There is a dispute over whether or not Van Merlo gave him permission. But was there another little side issue? Did he give him permission to work on personal projects as long as it wasn't on company time, or did he give him permission in general? We don't think he gave him permission at all to start with. I mean, and the commission found that they did not give permission. The commission looked at all of the evidence, and your Honor is exactly right. The commission has before them these inconsistent statements, or alleged inconsistent statements. There is some question as to exactly how this came about in the beginning, whether it was stated more than once that he gave permission. The arbitrator noted in the report that the OSHA report seems to state there was multiple times that there was this statement, but it's unclear whether there were multiple statements, or one statement repeated multiple times through the report. And he was cross-examined extensively about the fire marshal report and the statements in the OSHA report. And at trial, Van Merlo explained that when he saw the OSHA report, he didn't see the final report, he didn't know these statements were in the report, so he saw the final report, and he went to the investigator and told him this is incorrect, and I want it removed. And the investigator noted that. So in any event, the arbitrator had before him, Van Merlo persistently denied making the statements. Correct. So where's the prejudice you're saying? There could have been 15 reports impeaching him. The trier effect ultimately can choose who to believe, the five reports or the witness testifying, right? Correct. And they chose to believe the witness testifying. And, you know, in looking at the credibility, it's not just this. There was the situation that Mr. McManus said, he no doubt had a tragic, being a victim of a tragic accident myself, I completely understand not remembering exactly what happened on the day of it. And what he testified is, I'm almost 100% sure I asked for permission, but I don't, he also testified he doesn't completely remember what happened. He had memory problems about what happened on the day of the accident. Van Merlo had no such memory problems. At the time of the hearing, Van Merlo was retired. S&Business wasn't even, S&M Bush, I'm sorry, wasn't even in business anymore. So there was really no disincentive for Mr. Van Merlo to get up there and tell the truth. You know, it may appear at first glance that Orsini is pretty close to this case, but it really isn't. Because in Orsini, the garage owner never gave the employee anything which caused the injury or the explosion. In this particular case, the employer allowed him to use the torch. I would not say that the employer allowed him to use the torch on explosive materials, or allowed him to use the torch to cut open these barrels. That's the whole point, that he didn't have permission. He was allowed to use the torch rarely, apparently, to work on equipment or to cut rebar. Even if there was acquiescence, it's limited to that, Your Honor. And furthermore, I would say that this case is very similar to Orsini, in that in Orsini, the reason that there was... In Orsini, the employee had permission to work on his personal car during work hours in the facility. And the reason that the accident occurred was because there was a missing pin in the transmission. It caused the car to jump forward and pin the guy's legs. In this case, the reason the accident happened was because he brought in a barrel that had explosive hazard chemicals in it. In Orsini, the accident would not have occurred, but for the fact that there was a defecting car, the missing pin. In this case, OSHA did cite the company for violations for not training on how to use an oxygen-acetylene torch in conjunction with a barrel with flammable liquid. They had no flammable liquid that they used, Your Honor. But I know that OSHA did cite it. I don't know what OSHA... In all honesty, I don't know if OSHA would normally cite that under the circumstances. But in this case, even if he had had training on how to use an acetylene torch for the purposes of which he might have been using it for work, training would not have extended. Under no circumstances would S.M. Bush have reasonably been anticipated to expect that someone would have brought in a barrel with a hazardous chemical like methane and used a torch to cut it open. Was there evidence presented as to what training should have been provided? You're saying... You're telling us here that training wouldn't have included the dangers of using an acetylene torch on a barrel with combustible materials inside. Was there evidence presented as to what training should have been provided? No, there was no evidence with regard to what training. The only evidence that he did not receive... He testified... Sorry. Mr. McMahon testified that he didn't have training on it. And there was testimony that they only used water-based chemicals. Okay. Was there anything in the record... There was in the record, I think I recall, that they did cut barrels at their facility for wash barrels. And the barrels would be barrels that... It's a little tricky. What the testimony in the record said was that at the St. Louis plant, when he was there, they maybe once every two years cut a barrel open to use as a water barrel. It was a barrel from their facility that had water-based chemicals in it. There was no evidence that there was ever any barrels cut open at any facility. Right. Okay. So there's no evidence that this facility was ever... Or that someone in Mr. McManus's position would have been asked to do that. So it's reasonable to assume that training in oxy-acetylene cutting would probably, site-specific, would have even involved training in cutting a barrel. Is that correct or not? I'm sorry, can you repeat the question, Your Honor? Well, then there's no reason to believe that if you have site-specific training in using an oxy-acetylene torch, that site-specific, that there would be any training in proper cutting of barrels. I believe that would be accurate. Okay. And I mean, there's nothing to indicate... If I understood your question correctly... Well, my question is that I think you're saying that he was using the torch for cutting rebar, which is used in vaults. Correct. Or using it for tool repair in some fashion. But there's no evidence there that at this site there was cutting of barrels that it would be reasonably expected that he would use a torch to cut a barrel. Or that he would be warned not to cut a barrel with combustible material. Well, and... I mean, especially combustible materials, since they didn't have those on site, Your Honor. And I think that additionally... Well, you're telling me they didn't cut barrels on site. Well, and I said there's no evidence that they did. I can't say... Okay. ...that they did not. But I think, too, that another thing to keep in mind is that they had two people. There's evidence that they had two people who did the majority of the work with the acetylene torch. There was two people who did most of the welding because they had experience doing that. And they were always around if help be needed. And they were the ones who did the majority of the work with the acetylene torch. So, again, there's no evidence, and this is merely my supposition, but I would think that if any type of work needed to be done with regard to cutting barrels open, then it would have gone to the person who had the most experience, some person who regularly used the acetylene torch. I may be wrong, but I thought that his testimony was that if barrels needed to be cut, they would be the employer's barrels, and it would always be done at the St. Louis plant. I believe that it had been done at the St. Louis plant. I don't know that it was always done at the St. Louis plant and then exported out to other facilities. I think he was testifying about his experience when he was at the St. Louis plant. When the barrels needed to be cut there, maybe once every couple of years, it was always using their own barrels. Is this site, or similar sites, regulated under OSHA? I would believe, I mean, it came under OSHA for use, so I would believe that OSHA, yes. Does OSHA have a standard protocol of training for any work site that regularly or occasionally employs an oxy-acetylene cutting unit? There was no evidence in the record with regard to that. Okay. But getting back for a minute to Orsini, just as if that car, the problem in this case was the introduction of a hazardous chemical by Mr. McManus under the job site. So just as that car, a car missing its head, was introduced and there was the cause of the accident, the cause of the accident in this case was the introduction of a barrel that contained a hazardous explosive chemical. There was no evidence that there was a defect with the torch. There was no evidence that the torch was mishandled. In fact, there was no evidence that any other time that he had ever used these torches, the acetylene torch, even though it was apparently very rare, there was no evidence that any other time that he had ever used it that he had any type of problems with it. Well, but there's no problem with the torch. The problem is putting the torch to a barrel that contains hazardous material. There's nothing wrong. No one ever said there was something defective about the torch. Well, and, Your Honor, I would think using the torch would be the same as using the wrench of the screwdriver while you were working on the car and overseeing. The cause of it was the fact that the pin was missing. That's what ultimately caused this. If that pin had been there, that car would not have jumped forward and pinned its legs. In cutting the barrel, if he had cut that barrel with the torch, it would not have exploded but for the fact that it had a hazardous explosive chemical in it, a hazardous explosive chemical that was introduced by Mr. McManus when he acquired them off-site and brought them onto the premises. Without the permission of S&M. Still, doesn't this case still boil down to permission? What if that barrel said, okay, bring a barrel on, whatever kind of barrel you want to bring onto the premises, and you're going to say, well, it contains something hazardous. If he gave them permission to do that, you might still have a problem. But I think in this case, your strongest argument is the arbitrator believed him. He didn't give them any permission. Ergo, the case is over. I would agree that that is our strongest argument, Your Honor. But I do believe Orsini also does say that acquiescence of permission alone is not enough to make a personal risk. It does say that. And it's the word alone that's key there. And what Mr. Hazel would say is, we're not talking about that alone. We're saying, you know. That he did have the training. Right. And my point, again, would turn back to, why would they have ever expected that they needed to give him training on how to use a torch like that around an explosive chemical when they don't use explosive chemicals? And I don't really want to get started on anything else, Your Honor, unless you have anything specific that... Thank you very much. Thank you, Counsel. Thank you, Counsel. Yes, it's good exercise for him. The ultimate cause is critical here. The ultimate cause, and what Counsel said about the cause of the accident, the cause of the accident, yes, is that he brought it there. But the cause of the accident is non-training. You have a 17, 18, 19-year-old young man with no training in a place, they probably never even heard of OSHA. So what evidence was presented then by Petitioner as to what training was necessary but omitted that led to this accident? I think our evidence was the fact that there was no training whatsoever. And when you're talking about something like an acetylene torch, and it's not a question, if you have someone that's got 20 years' experience on acetylene torches and someone who's been trained on acetylene torches, they know. You don't take this to the barrel. You don't know what's in the barrel. That's a given. I'm sorry. So is the arbitrator to assume what the training would have included? Well, that's one of the reasons the OSHA report, we think, is important, because the OSHA report in their citation, which is the big citation on this, explicitly states that they did not recognize its responsibility for the safe usage of cutting or welding equipment and did not insist that cutters or welders and their supervisors were suitably trained in safe operation of equipment. Here's the important part. And the safe use of the process. It goes exactly to what we're talking about here. It's the whole process of being trained. If you're trained as a child to run out in the street after a ball, look both ways, all of that, that's just kind of embedded in that. But when you're trained on this kind of equipment, you're trained for the entire process, not just do you touch it to a water-based barrel. You're talking about training and training as to knowledge of the danger, not knowledge as to the process. There wasn't a safe method of cutting, as Torres was saying. The training should have been. Actually, there is. Well, okay. Which is to wash it so thoroughly, and that was another one of their citations. That's what OSHA was saying. You wash this thing so thoroughly that you know. But when you're trained and then you have experience, that is the process that we're talking about as far as what someone like Martin McManus should know and should not know. Let's assume he had perfect training. You raise a different point. I'd like you to answer this. He had perfect training. He was on the job for 20 years. He was a master at using the acetylene torch, okay? Then he, unbeknownst to the employer, brings something on and it blows up. So you're saying in that case, he can't recover. I don't have a case. I don't have a case. That's exactly right. Yes. Wait, what's the answer? That's exactly right. He doesn't have a case. This case. Okay. I agree. So then it turns on the permission. It doesn't turn on the training. No, the permission is one of the, you know, just based on case law, I don't think permission is as important as what caused the accident. Orsini, as this court probably knows, it was awarded, it was taken away, it was affirmed, it was approved, it was taken away and went to the Supreme Court. And the Supreme Court says it all comes down to one thing, what caused the accident. I think it's more of is it a personal risk versus an employment risk. And they said it was the retaining pin on the transmission, which was the cause of the accident. That made it purely personal, nothing to do with the employer. That's the difference. So what you're saying, the cause of the accident was permitting an untrained person to use this dangerous equipment. Well, I think they go hand in hand, absolutely. I mean, the permission has to be a part of your theory under the facts of this case. I think permission has to go there because the case law really talks about, you know, acquiescence by itself. But I think it would be a tougher case for me to prove if you found that he did not have the training and the expertise and so forth. If, let's say that he didn't get permission, but they allowed us all, this is a very small place. This is not some place where you could do something without being seen. So that's how acquiescence. And sometimes the courts or the commission, they confuse permission and acquiescence. They're two different animals. So would it be tougher? Yes. But I think permission here is established by Mr. Menemanis' testimony, Mr. Van Mierle's testimony about, or them saying he's an unbiased witness. Oh, that's not good. There's nothing in the record to support that. Was he gone from there? Yeah, but we don't know if he's not, you know, if his pension is dependent on this company or if he's related to the owners of the company. We don't know anything. It was improper for the arbitrator to put that in there that he was unbiased because he had left the company and so forth. That's, you know, what I say about he is biased because of all these other things could be said too. But this was a situation where when you have the OSHA report just on his face, the fire marshal's report, and if you rule that the OSHA report and the fire marshal's report don't go in, then you have to affirm. But if they go in, those two documents, those two exhibits, plus his testimony, gets this out of, overcomes a manifest white argument. Okay. Thank you, counsel, both. This matter will be taken under advisement. The written disposition shall issue. The court will stand in recess until 9 a.m. tomorrow morning.